# United States Court of Appeals
## For the First Circuit

---

No. 05-1811

DANIEL PAGÁN ET AL.,

Plaintiffs, Appellees,

v.

SILA MARÍA CALDERÓN, IN HER INDIVIDUAL CAPACITY,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

---

Before

Selya, Circuit Judge,
Hansen,* Senior Circuit Judge,
and Lynch, Circuit Judge.

---

Susana I. Peñagaricano-Brown, Assistant Solicitor General, with whom Salvador J. Antonetti-Stutts, Solicitor General, Mariana Negrón-Vargas and Maite D. Oronoz-Rodríguez, Deputy Solicitors General, were on brief, for appellant.
Guillermo F. DeGuzmán, with whom DeGuzmán & Gierbolini Law Offices, P.S.C. was on brief, for appellees.

---

May 16, 2006

---

*Of the Eighth Circuit, sitting by designation.

**SELYA**, **Circuit Judge**.  This interlocutory appeal follows the entry of an order denying, in relevant part, a public official's motion to dismiss based on qualified immunity.  See Pagán v. Calderón, No. 04-1296, slip op. at 7 (D.P.R. Mar. 30, 2005) (D. Ct. Op.).  It raises significant questions concerning the doctrine of standing and the prosecution of claims of political discrimination.

The underlying action involves multiple plaintiffs and multiple defendants (although Sila María Calderón, in her individual capacity, is the only defendant before us).  The plaintiffs' overarching claim is that Calderón, then the governor of Puerto Rico, improperly influenced the decision of a government lender to reject a loan sought by the main plaintiff, ARCAM Pharmaceutical Corporation.  On the defendants' motions to dismiss, see Fed. R. Civ. P. 12(b)(6), the district court rendered a mixed decision.  To the extent that Calderón's denied motion rested on the ground of qualified immunity, she appealed.  See Mitchell v. Forsyth, 472 U.S. 511, 530 (1985) (allowing interlocutory appeals of certain denials of qualified immunity).  For the reasons that follow, we conclude that no plaintiff other than ARCAM has standing to pursue the appealed federal claims asserted against Calderón. Moreover, we conclude that, with respect to those claims, ARCAM has failed adequately to plead a violation of its constitutional rights.  Accordingly, we reverse the challenged rulings, direct the

-2-

district court to grant Calderón's motion for dismissal, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Because this is an interlocutory appeal from the denial of a Rule 12(b)(6) motion to dismiss grounded on qualified immunity, we — like the lower court — must accept as true the factual averments of the plaintiffs' complaint. See Limone v. Condon, 372 F.3d 39, 42 (1st Cir. 2004).

ARCAM, a corporation chartered under the laws of Puerto Rico, was formed in 2000 for the purpose of engaging in the manufacture of pharmaceutical products. Its principal shareholder and chief executive officer is plaintiff Ernesto Vilanova Vélez (Vilanova). Plaintiffs Cristino Agosto Reyes, Martin Souto, and Christopher Molina (collectively, the guarantors) are minority shareholders. Vilanova and the guarantors have, from time to time, personally guaranteed certain of ARCAM's corporate debts.

Shortly after its formation, ARCAM paid $4,500,000 to acquire land and buildings in Hormigueros, Puerto Rico (the Property) as a site for manufacturing pharmaceutical products. To fund this transaction, finance improvements, and secure operating capital, ARCAM obtained a $10,000,000 loan from Westernbank. In exchange, it granted Westernbank a first mortgage on the Property. The complaint alleges that, despite the relatively modest purchase price, the Property actually was worth $24,000,000.

-3-

Early on, ARCAM retained plaintiff Daniel Pagán as a consultant. Pagán had occupied various high-ranking positions in the administration of Governor Pedro Rosselló. As a result, Pagán became known as a political insider and a strong supporter of the reigning New Progressive Party (NPP).

In the general elections of November 2000, the voters chose Calderón, running under the banner of the Popular Democratic Party (PDP), to succeed Rosselló. The upshot was that a PDP administration supplanted an NPP administration. The new regime launched a number of investigations into the performance of persons close to Rosselló. In the wake of one such probe, the Calderón administration filed criminal charges against Pagán, alleging bid-rigging. See P.R. Laws Ann. tit. 33, § 4353a. Although a local court eventually dismissed the charges, the plaintiffs envision this unwarranted prosecution as emblematic of the "political witch-hunt and persecution policy implemented by defendant Calderón and her administration against individuals politically affiliated [with] the NPP and/or . . . the administration of Governor Pedro Rosselló."

During the year 2002, Pagán assisted ARCAM in efforts to upgrade its plant, obtain manufacturing equipment, and secure federal Food and Drug Administration approval for its product line. In addition, Pagán represented ARCAM in third-party negotiations and before various administrative agencies. Through those

endeavors, Pagán became publicly identified with ARCAM and top-echelon members of the PDP acquired knowledge of Pagán's ties to the company.

By mid-2002, ARCAM had secured two pharmaceutical manufacturing contracts and had developed a purified water production line. Launching these ventures required access to new capital. To that end, ARCAM requested a $5,000,000 commercial loan from Banco de Desarrollo Económico para Puerto Rico (BDE), a government-sponsored banking institution that had been created to promote the "development of the private sector of the economy of Puerto Rico" by making capital available to firms "whose economic activity has the effect (directly or indirectly) of substituting imports." P.R. Laws Ann. tit. 7, § 611a(a). To assist BDE in fulfilling that mandate, the Puerto Rico legislature gave it the power to "loan money, with or without collateral, to any person, firm, corporation or other private organization when such loans are to be used to promote the government's purpose of developing the economy of Puerto Rico." Id. § 611b(d). The legislature tasked BDE's board of directors with administering and exercising this power. Id. § 611d(a). Upon receiving ARCAM's loan proposal, BDE requested amplitudinous information about ARCAM's finances and operations. After analyzing that data, BDE conditioned its approval of the loan on ARCAM's ability to convince Westernbank to subordinate the first mortgage on the Property that collateralized

-5-

its earlier $10,000,000 loan. ARCAM was unable to secure Westernbank's assent to this condition. BDE thereupon refused to make the loan despite ARCAM's assurance that it had obtained "equivalent" concessions from Westernbank. The complaint alleges that two BDE hierarchs, Vilma Pellot and Antonio Faría (both of whom were PDP stalwarts) played influential roles in bringing about the demise of the anticipated loan.

The complaint further alleges that, as a result of its failure to garner supplemental financing, ARCAM fell behind on its manufacturing obligations and was threatened with the loss of its pharmaceutical contracts. Out of desperation, it recast the $5,000,000 loan proposal and, in May of 2003, resubmitted it. BDE asked for more information, which ARCAM supplied. While Vilanova still could not convince Westernbank to subordinate its first mortgage, he volunteered that he would personally guarantee the new borrowing.

Throughout the deliberative process, ARCAM repeatedly reminded BDE that it was in immediate danger of losing its hard-won contracts without an infusion of new money. BDE's board of directors initially harkened to this entreaty and recommended approval of ARCAM's renewed application. But that was not the final word: Pellot and Faría, doing Calderón's bidding, twisted arms to bring about BDE's rejection of the renewed loan request. The complaint attributes this refusal to "the discriminatory

-6-

policies, instructions and/or misguided strategies of defendant Calderón against individuals associated [with] the former NPP administration; in this particular case aimed against plaintiff Pagán."

ARCAM's failure to obtain financing rendered the company's business moribund. It has ceased operations, remains unsure if it can salvage its pharmaceutical contracts, and is uncertain whether it will be able to resume operations.

Left in these dire straits, the plaintiffs — ARCAM, Vilanova, Pagán, and the guarantors — filed suit in the United States District Court for the District of Puerto Rico.[1] Their complaint, brought pursuant to 42 U.S.C. § 1983, alleges, inter alia, that numerous defendants (including BDE, Pellot, Faría, and Calderón) violated the free association guarantee of the First Amendment, the due process guarantee of the Fourteenth Amendment, and the equal protection guarantee of the Fourteenth Amendment in turning down ARCAM's loan application. The complaint also alleges that BDE took this action notwithstanding ARCAM's in-hand contracts and the offer of a personal guarantee, while in the same time frame

---

[1]The spouses and conjugal partnerships of each of the aforementioned individuals joined as plaintiffs. Because those claims are wholly derivative, we refer for simplicity's sake only to the named plaintiffs. Our decision with respect to each individual is, of course, binding on his spouse and conjugal partnership.

it granted a loan to Pollos Picú, an entity that was experiencing extremely difficult financial conditions.

Calderón filed a motion to dismiss, contending that the complaint failed to state any cognizable federal claim against her and that, in any event, the doctrine of qualified immunity barred the relief sought against her (money damages). The plaintiffs opposed the motion.

On March 30, 2005, the district court granted Calderón's motion in part and denied it in part. See D. Ct. Op. at 8. Specifically, the court dismissed the First Amendment claims brought by ARCAM, Vilanova, and the guarantors — claims premised on the plaintiffs' right to associate with Pagán (an NPP kingpin). Id. at 3. The court also dismissed the plaintiffs' procedural due process claims. Id. at 5. Shifting gears, the court cited the plaintiffs' allegations that Calderón's politically discriminatory animus toward Pagán was the root cause of BDE's refusal to accommodate the loan request and declined to dismiss Pagán's First Amendment claim. Id. at 3-4. For much the same reason, it allowed the various plaintiffs' substantive due process and equal protection claims to stand. Id. at 6. In making these latter rulings, the court explicitly rejected Calderón's qualified immunity defense, without prejudice, however, to its reassertion on a better developed record. Id. at 7. This timely appeal ensued.

**II. JUSTICIABILITY**

We pause at the outset to clarify certain matters related to our jurisdiction and to the parties' standing.

### A. **Appellate Jurisdiction**.

This is an interlocutory appeal in which Calderón assigns error to the district court's rejection of her qualified immunity defense vis-à-vis Pagán's First Amendment claim and the plaintiffs' collective substantive due process and equal protection claims. The other rulings made by the district court in its opinion of March 30, 2005 are not before us. Accordingly, we take no view of them.

Although our appellate jurisdiction typically is limited to the review of final orders and judgments, see 28 U.S.C. § 1291, that limitation sometimes is relaxed when a public official, qua defendant, unsuccessfully asserts a qualified immunity defense in a pretrial motion. In broad-brush terms, the denial of such a motion is appealable without awaiting the entry of final judgment to the extent that the immunity issue is a purely legal one, not requiring either resolution of conflicting facts or an examination of the district court's conclusion that a genuine issue of material fact exists. Valdizán v. Rivera-Hernandez, ___ F.3d ___ , ___ (1st Cir. 2006) [No. 05-2215, slip op. at 3] (citing Johnson v. Jones, 515 U.S. 304, 318 (1995)). Because Calderón's appeal fits snugly within that integument, we have jurisdiction to entertain it. See,

e.g., <u>Vélez-Díaz</u> v. <u>Vega-Irizarry</u>, 421 F.3d 71, 77 (1st Cir. 2005); <u>Limone</u>, 372 F.3d at 43.

## B. **Standing**.

A federal court must satisfy itself as to its jurisdiction, including a plaintiff's Article III standing to sue, before addressing his particular claims, regardless of whether the litigants have raised the issue of standing. <u>See</u> <u>Orr</u> v. <u>Orr</u>, 440 U.S. 268, 271 (1979); <u>Juidice</u> v. <u>Vail</u>, 430 U.S. 327, 331 (1977); <u>see</u> <u>also</u> <u>Warth</u> v. <u>Seldin</u>, 422 U.S. 490, 498 (1975) (explaining that standing is a threshold issue in every federal case). The standing inquiry is both plaintiff-specific and claim-specific. Thus, a reviewing court must determine whether each particular plaintiff is entitled to have a federal court adjudicate each particular claim that he asserts. <u>Allen</u> v. <u>Wright</u>, 468 U.S. 737, 752 (1984); <u>Donahue</u> v. <u>City of Boston</u>, 304 F.3d 110, 116 (1st Cir. 2002). Only if a particular plaintiff has standing to pursue a particular claim will the court proceed to assess the application of the qualified immunity doctrine to that claim.

Standing involves a collocation of constitutional requirements and prudential concerns. <u>See</u> <u>Valley Forge Christian Coll.</u> v. <u>Ams. United For Separation of Church & State, Inc.</u>, 454 U.S. 464, 471 (1982). The Constitution confines federal courts to the adjudication of actual cases and controversies. <u>See</u> U.S. Const. art. III, § 2, cl. 1; <u>Allen</u>, 468 U.S. at 750. An actual

-10-

case or controversy exists when the party seeking to invoke the court's jurisdiction (normally, the plaintiff) has a "personal stake in the outcome" of the claim asserted. Baker v. Carr, 369 U.S. 186, 204 (1962). To satisfy the personal stake requirement, the plaintiff must pass a tripartite test. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Ramírez v. Ramos, 438 F.3d 92, 97 (1st Cir. 2006).

The first of these prerequisites deals with harm. The plaintiff must adequately allege that he "suffered or is threatened by [an] injury in fact to a cognizable interest." Save our Heritage, Inc. v. FAA, 269 F.3d 49, 55 (1st Cir. 2001). An injury in fact is one that is concrete and particularized, on the one hand, and actual or imminent (as opposed to conjectural or hypothetical), on the other hand. Lujan, 504 U.S. at 560. In turn, a particularized injury is one that "affect[s] the plaintiff in a personal and individual way." Id. at 560 n.1.

The second prerequisite deals with causation (what some courts have called "traceability"). To meet this requirement, the plaintiff must adequately allege that the asserted injury is causally connected to the challenged conduct. Id. at 560. This causal connection must be demonstrable; in other words, it "cannot be overly attenuated." Donahue, 304 F.3d at 115.

-11-

The third prerequisite is redressability. The plaintiff must adequately allege that a favorable result in the litigation is likely to redress the asserted injury. Lujan, 504 U.S. at 561.

In addition to these Article III prerequisites, prudential concerns ordinarily require a plaintiff to show that his claim is premised on his own legal rights (as opposed to those of a third party), that his claim is not merely a generalized grievance, and that it falls within the zone of interests protected by the law invoked. Ramírez, 438 F.3d at 98; N.H. Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 15 (1st Cir. 1996). These prudential considerations, though important, are not as inexorable as their Article III counterparts. See, e.g., United States v. AVX Corp., 962 F.2d 108, 116 (1st Cir. 1992) (recognizing associational standing exception).

Against this backdrop, we proceed to consider the issue of standing plaintiff by plaintiff and claim by claim.

1. **ARCAM**. In the mix of claims that are before us, two are ARCAM's: its substantive due process and equal protection claims (its other claims against Calderón were dismissed below and are not implicated in this appeal). As to these claims, ARCAM easily passes through both the Article III and prudential standing screens.

In theory at least, BDE's refusal to grant ARCAM the loan for which it applied constitutes an injury in fact (a loss of financing) particular to the corporation. Inasmuch as ARCAM alleges

-12-

that this refusal stemmed from Calderón's strong-arming of the board of directors, the injury is traceable to the challenged conduct. The redressability element is satisfied because a favorable judicial decision on this claim would redress the injury by compensating ARCAM for the harm it suffered.

Prudential considerations also counsel in favor of a finding of standing. Here, ARCAM is seeking to protect its own rights. Moreover, the alleged misconduct culminated in a particularized event (the denial of the loan), and the effects of that misconduct are sufficiently tangible.

2. **Vilanova and the guarantors**. Vilanova and the guarantors are before us in regard to substantive due process and equal protection claims (as was true of ARCAM, their other claims against Calderón were dismissed below and are not implicated in this appeal). These four plaintiffs premise their right to recover on their status as shareholders and creditors of ARCAM.[2] Pertinently, the complaint alleges that ARCAM was unable to fulfill its contractual obligations when it did not receive the requested loan,

---

[2]Vilanova is also an ARCAM employee. However, he does not claim to have suffered any cognizable injury in that capacity. At any rate, the general rule is that an employee does not have standing to sue when the alleged misconduct is directed at the corporation for which he worked and, therefore, the employee's loss of income or employment is merely incidental to the direct injury inflicted upon the corporation. See, e.g., Willis v. Lipton, 947 F.2d 998, 1000-01 (1st Cir. 1991); Warren v. Mfrs. Nat'l Bank, 759 F.2d 542, 545 (6th Cir. 1985); see also SAS of P.R., Inc. v. P.R. Tel. Co., 48 F.3d 39, 45 (1st Cir. 1995). That appears to be the situation here.

that it is unsure if its contracts can be salvaged, that it has shut down its operations, and that it has no future prospects for reopening. The stockholder claims presumably operate from the premise that this reversal of fortune has depreciated the value of the plaintiffs' stock.

As a general rule, a corporation and its shareholders are distinct juridical persons and are treated as such in contemplation of law. See In re Dein Host, Inc., 835 F.2d 402, 405 (1st Cir. 1987). In terms of standing, this separateness has led to the tenet that "[a]ctions to enforce corporate rights or redress injuries to [a] corporation cannot be maintained by a stockholder in his own name . . . even though the injury to the corporation may incidentally result in the depreciation or destruction of the value of the stock." Id. at 406 (citation and internal quotation marks omitted); see Bishay v. Am. Isuzu Motors, Inc., 404 F.3d 491, 495 (1st Cir. 2005) (noting the general rule that only the corporation, a receiver, or a stockholder acting derivatively in the corporation's name may sue to redress an injury to the corporation). The tenet holds true even if the shareholder is the sole owner of the corporation's stock. See Diva's Inc. v. City of Bangor, 411 F.3d 30, 42 (1st Cir. 2005); In re Dein Host, 835 F.2d at 406.

To be sure, there are exceptions to virtually every general rule — and the rule that a shareholder cannot sue in his own name for an injury sustained by the corporation is not ironclad.

-14-

A shareholder, for example, may be able to bring an action if he sustains an injury that "is peculiar to him alone, and [that] does not fall alike upon other stockholders." Roeder v. Alpha Indus., Inc., 814 F.2d 22, 30 (1st Cir. 1987) (citations and internal quotation marks omitted); accord Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc., 295 F.3d 1065, 1072 (10th Cir. 2002). The case law also suggests that there may be room for an exception if it is absolutely inconceivable that the corporation itself would pursue a claim for the misconduct. See, e.g., Kavanaugh v. Ford Motor Co., 353 F.2d 710, 717 (7th Cir. 1965) (allowing shareholder standing in a case in which the alleged malefactor owned all of the corporation's voting stock). Here, however, the complaint does not allege that any of the individual shareholders sustained a particularized, nonderivative injury that might deflect application of the usual shareholder standing rule[3] or that any other exception pertains. To cinch matters, not only have Vilanova and the guarantors, qua shareholders, sued to redress an injury to the corporation, but the corporation itself also has sued, in the same complaint and on the same theories, for the same harm. In such circumstances, section 1983 affords no right of action to the

---

[3]In this regard, the complaint merely states that, as shareholders, Vilanova and the guarantors have "rights and liabilities towards" ARCAM and that they have "a tangible and intangible property interest in the benefits and profits" of ARCAM. Any injury based on how Calderón's conduct impacted these interests is merely derivative of ARCAM's alleged injury.

individual shareholders.  See Diva's, 411 F.3d at 42 (holding that shareholder who failed to allege any injury separate from the injury to the corporation lacked standing to bring a § 1983 claim); Potthoff v. Morin, 245 F.3d 710, 717 (8th Cir. 2001) (explaining that an individual shareholder's section 1983 claim "can survive only if he has alleged that he personally has suffered a direct, nonderivative injury"); Flynn v. Merrick, 881 F.2d 446, 450 (7th Cir. 1989) ("Filing suit under 42 U.S.C. § 1983 does not diminish the requirement that the shareholder suffer some individual, direct injury.").

The fact that the complaint contains a demand for emotional distress damages (which, presumably, were incurred by the individual plaintiffs and not by ARCAM) is insufficient to confer individual standing on any of the stockholders.  After all, the complaint does not suggest that this injury is anything but derivative of ARCAM's failure to receive the loan.  It is, therefore, squarely within the proscription of the shareholder standing rule.  See Bellows v. Amoco Oil Co., 118 F.3d 268, 277 n.27 (5th Cir. 1997) (holding that shareholder had no individual standing to sue for emotional distress when that distress was simply a consequence of the corporation's direct injury).

This brings us to the plaintiffs' status as creditors of ARCAM (by which they apparently mean either that ARCAM owes them money that it will now be unable to repay or that they are exposed

-16-

to a contingent liability because the denial of the BDE loan rendered ARCAM unable to satisfy other debts).  That status does not alter the decisional calculus.  As is the case with shareholders, creditors do not have standing to sue in their personal capacities unless the alleged misconduct causes harm to them separate and distinct from the injury inflicted upon the debtor corporation.  See Ashland Oil, Inc. v. Arnett, 875 F.2d 1271, 1280 (7th Cir. 1989).

In the case at hand, any injury related to either the plaintiffs' foregone loans or their contingent liability for ARCAM's debts is simply derivative of the direct injury to ARCAM (the loss of incremental financing).  This type of harm is insufficient to confer creditor standing.  See Guides, 295 F.3d at 1073 (rejecting the premise that one's status as a guarantor confers standing "to assert an individual claim against a third party where that harm is derivative of that suffered by the corporation"); Stein v. United Artists Corp., 691 F.2d 885, 896 (9th Cir. 1982) (concluding that a corporation's guarantors lack standing when their alleged injuries "reflect the injury to the corporation, which forced it to default on the loans"); see also SAS of P.R., Inc. v. P.R. Tel. Co., 48 F.3d 39, 45 (1st Cir. 1995).

The short of it is that where, as here, the corporation incurs the only direct injury from the alleged misconduct, the corporation (in the absence of special circumstances, not present here) is the only proper party to bring suit for that injury.  It

-17-

follows inescapably that neither Vilanova nor the guarantors have standing to proceed with their Fourteenth Amendment claims.

3. **Pagán**. Three of Pagán's claims against Calderón are before us: his First Amendment, substantive due process, and equal protection claims. We conclude that he lacks standing to pursue any of them.

Pagán asserts injury in fact on the basis that Calderón's meddling with ARCAM's loan request was driven by political animus aimed squarely at him. This assertion is wide of the mark: the standing inquiry turns on the plaintiff's injury, not the defendant's motive. Thus, when a government actor discriminates against a corporation based on a protected trait of a corporate agent, it is the corporation — and only the corporation — that has standing to seek redress. See Guides, 295 F.3d at 1072-73 (holding that corporation alone had standing to pursue claim that lease sought by corporation was denied because of employee-shareholder's race); Potthoff, 245 F.3d at 717-18 (holding that employee lacked standing to assert section 1983 claim when government agency terminated corporation's lease because of employee's criticism of the mayor). In other words, the fact that animus toward the agent sparked mistreatment of the principal does not create an exception to the rule that an agent's section 1983 claim can flourish only if

he alleges that he personally suffered a direct, nonderivative injury.[4]  Potthoff, 245 F.3d at 717.

In an effort to detour around this roadblock, Pagán maintains that he stood to benefit from ARCAM's success and, thus, was injured personally when the business cratered for want of financing.  Relatedly, he maintains that, as a consultant, he depended on ARCAM's viability to earn his living.  These allegations are insufficient to cloak Pagán with standing.  It is not enough for the agent to allege an injury that is qualitatively different from that suffered by the principal; rather, the agent must allege an injury that does not derive from the injury to the principal.  See Bellows, 118 F.3d at 276-77.  The injuries that Pagán alleges are plainly derivative of the ascribed harm to ARCAM.

That ends this aspect of the matter. Because the complaint contains no allegation that Pagán suffered any nonderivative injury, he lacks standing to assert any of the section 1983 claims that are at issue here.

---

[4]This does not mean, of course, that there are no exceptions to the general rule that a plaintiff must allege a nonderivative injury.  There is, for example, an exception for associational standing.  This exception allows an association, which has not itself suffered injury, to premise its standing to bring suit on its members' injuries so long as the interests at stake are germane to the association's purpose and the suit does not require member participation.  See AVX Corp., 962 F.2d at 116.  That exception has no bearing here.

## III. QUALIFIED IMMUNITY

Our exegesis into standing disposes of all the claims presently on appeal save for ARCAM's substantive due process and equal protection claims against Calderón. The lingering question, then, is whether the district court erred in refusing to dismiss either or both of those claims on the ground of qualified immunity. In answering that question, we employ de novo review of the district court's decision, assume the truth of the complaint's factual allegations (but not its unsupported conclusions and animadversions), and draw all reasonable inferences therefrom in ARCAM's favor. See Limone, 372 F.3d at 42-43.

Qualified immunity is a judge-made doctrine created to limit the exposure of public officials to damages actions, thereby fostering the effective performance of discretionary functions in the public sector. Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). The reach of this doctrine is long, but not infinite. It protects all but "the plainly incompetent [and] those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). As that exclusion has been interpreted, the doctrine does not shield public officials who, from an objective standpoint, should have known that their conduct was unlawful. Davis v. Scherer, 468 U.S. 183, 193 (1984); Surprenant v. Rivas, 424 F.3d 5, 14 (1st Cir. 2005).

Relying on Supreme Court precedent, see, e.g., Saucier v. Katz, 533 U.S. 194, 200-02 (2001), we have developed a three-step

algorithm for the determination of whether a state actor is entitled to qualified immunity. See Limone, 372 F.3d at 44. In sequential order, "[w]e consider (i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right."[5] Id. Thus, a court called upon to review a denied Rule 12(b)(6) motion premised on qualified immunity ordinarily should consider, as a first step, whether the facts set forth in the complaint, taken in the light most congenial to the complaining party, adequately allege that the defendant violated a federally-secured right. As we explain below, ARCAM cannot satisfy this requirement.

Our consideration of this issue proceeds on the premise that there is no heightened pleading requirement in civil rights cases. Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61, 66-67 (1st Cir. 2004). The complaint need do no more than satisfy the basic notice pleading requirements of the Civil Rules.

---

[5]There is some debate about whether our approach to qualified immunity issues should be collapsed from three steps into two. See Higgins v. Penobscot County Sheriff's Dep't, ___ F.3d ___, ___ (1st Cir. 2006) (Howard, J., concurring) [No. 05-2375, slip op. at 11]. Here, however, ARCAM's claims fail at the first step, so the number of succeeding steps is irrelevant.

<u>Centro Medico del Turabo, Inc.</u> v. <u>Feliciano de Melecio</u>, 406 F.3d 1, 5 (1st Cir. 2005). That standard, however, still requires that the complaint "set forth minimal facts as to who did what to whom, when, where, and why." <u>Educadores</u>, 367 F.3d at 68; <u>accord</u> <u>Aponte-Torres</u> v. <u>Univ. of P.R.</u>, ___ F.3d ___, ___ (1st Cir. 2006) [No. 05-1534, slip op. at 6-7].

In this instance, the conduct of which ARCAM complains implicates section 1983, which imposes liability on officials acting under the color of state law who infringe the federally-secured rights of private parties.[6] ARCAM charges that Calderón, acting under color of law as the governor of Puerto Rico, violated its substantive due process and equal protection rights when she improperly influenced BDE's review of ARCAM's loan application. We conclude that ARCAM has failed to allege facts adequate to support either charge (and that, therefore, Calderón is entitled to qualified immunity).

### A. <u>Substantive Due Process</u>.

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving a person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This guarantee has both substantive and procedural components. The substantive due process guarantee functions to protect individuals

---

[6]For purposes of section 1983, Puerto Rico is the functional equivalent of a state. <u>Redondo-Borges</u> v. <u>U.S. Dep't of Hous. & Urban Dev.</u>, 421 F.3d 1, 7 (1st Cir. 2005).

from particularly offensive actions on the part of government officials, even when the government employs facially neutral procedures in carrying out those actions. Daniels v. Williams, 474 U.S. 327, 331 (1986). The substantive due process guarantee does not, however, serve as a means of constitutionalizing tort law so as to "impos[e] liability whenever someone cloaked with state authority causes harm." County of Sacramento v. Lewis, 523 U.S. 833, 848 (1998).

ARCAM is in error when it posits that it can prevail on its substantive due process claim either by showing that Calderón's conduct was conscience-shocking or by showing that her conduct deprived it of a protected liberty or property interest. This disjunctive proposition is incorrect. Where, as here, a plaintiff's substantive due process claim challenges the specific acts of a state officer, the plaintiff must show both that the acts were so egregious as to shock the conscience and that they deprived him of a protected interest in life, liberty, or property. See Rivera v. Rhode Island, 402 F.3d 27, 34 (1st Cir. 2005) (stating that "[i]t is not enough to claim the governmental action shocked the conscience" but that a plaintiff must also show a deprivation of a protected interest). Consequently, "conscience-shocking conduct is an indispensable element of a substantive due process challenge to executive action." DePoutot v. Raffaelly, 424 F.3d 112, 118 n.4 (1st Cir. 2005).

-23-

There is no scientifically precise formula for determining whether executive action is — or is not — sufficiently shocking to trigger the protections of the substantive due process branch of the Fourteenth Amendment. See Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992) (referring to the inquiry as "virtually standardless"). Accordingly, the analysis will vary with the subject matter and the circumstances. See Rivera, 402 F.3d at 36; Amsden v. Moran, 904 F.2d 748, 754 n.5 (1st Cir. 1990). It is, therefore, unsurprising that the requisite inquiry involves "a comprehensive analysis of the attendant circumstances before any abuse of official power is condemned as conscience-shocking." DePoutot, 424 F.3d at 119.

The case law contains some helpful generalizations. We know, for example, that in order to shock the conscience, conduct must at the very least be "extreme and egregious," id. at 118, or, put another way, "truly outrageous, uncivilized, and intolerable," Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999). We also know that "[m]ere violations of state law, even violations resulting from bad faith," do not invariably amount to conscience-shocking behavior. DePoutot, 424 F.3d at 119. Rather, conscience-shocking behavior "must be stunning." Amsden, 904 F.2d at 754 n.5.

Here, ARCAM contends that Calderón transgressed its substantive due process rights when, through Pellot and Farìa, she exerted undue influence over BDE's directors so that they would deny

-24-

ARCAM's loan request.  It asseverates that her discriminatory animus against the former NPP administration in general and Pagán (a leading NPP factotum) in particular sparked this skulduggery.  This abuse of political power, ARCAM says, was so raw as to shock the conscience.  We do not agree.

When the Puerto Rico legislature created BDE, it granted the board of directors the power to exercise broad discretion in determining whether to grant or deny certain loans.  P.R. Laws Ann. tit. 7, §§ 611b(d), 611d(a).  Given this framework, we think that our analysis of ARCAM's claim logically should be informed by the standards elucidated in the case law involving denied permits and licenses.  We look to those cases to guide our inquiry into whether ARCAM's allegations, even if true, cross the substantive due process threshold.  In doing so, however, we remain mindful of the admonition that we should be "reluctant to expand the concept of substantive due process." Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992).

We have held, with a regularity bordering on the monotonous, that the substantive due process doctrine may not, in the ordinary course, be invoked to challenge discretionary permitting or licensing determinations of state or local decisionmakers, whether those decisions are right or wrong. See, e.g., Collins v. Nuzzo, 244 F.3d 246, 251 (1st Cir. 2001); Nestor Colon, 964 F.2d at 45; Amsden, 904 F.2d at 757-58; Creative Env'ts,

Inc. v. Estabrook, 680 F.2d 822, 829 (1st Cir. 1982). While we have "left the door slightly ajar for . . . truly horrendous situations," Nestor Colon, 964 F.2d at 45, any permit or license denial, no matter how unattractive, that falls short of being "truly horrendous" is unlikely to qualify as conscience-shocking.

This standard is rigorous but necessary. A lesser standard would run the unacceptable risk of "insinuat[ing] the oversight and discretion of federal judges into areas traditionally reserved for state and local tribunals," id., and would dash "any hope of maintaining a meaningful separation between federal and state jurisdiction," Creative Env'ts, 680 F.2d at 831.

The decided cases are instructive by negative implication. They present illustrations of conduct which, though disquieting and in many instances unlawful, has been held not to violate the substantive due process guarantee. ARCAM's complaint that BDE, at Calderón's urging, denied it a loan for which it qualified falls well within the mine-run of these cases. We conclude, therefore, that the mere withholding of the loan, simpliciter, cannot support a constitutional claim.

ARCAM attempts to distinguish this case from the mine-run on the basis of Calderón's discriminatory or retaliatory animus. That attempt is unavailing. Substantive due process is an inappropriate avenue of relief when the governmental conduct at issue is covered by a specific constitutional provision. See S.

-26-

County Sand & Gravel Co. v. Town of S. Kingstown, 160 F.3d 834, 835 (1st Cir. 1998) ("When a specific provision of the Constitution protects individuals against a particular kind of [misconduct] by government actors, individuals seeking redress . . . must assert their claims under that particular constitutional rubric instead of invoking the more generalized notion of substantive due process."); accord Lewis, 523 U.S. at 843; Graham v. Connor, 490 U.S. 386, 395 (1989).  Thus, to the extent that ARCAM relies on charges that Calderón's actions were driven by political motives, it has no substantive due process claim at all.  It is the First Amendment, not the Fourteenth Amendment, that guards individuals against state-sponsored acts of political discrimination or retaliation.  See, e.g., Ruiz-Casillas v. Camacho-Morales, 415 F.3d 127, 134 (1st Cir. 2005); Nestor Colon, 964 F.2d at 46.

That closes the book on this claim. Since ARCAM's allegations of political discrimination and retaliation are covered by the First Amendment, those allegations cannot serve as a basis for a substantive due process claim.[7]  See Nestor Colon, 964 F.2d at 46 (holding infirm a substantive due process claim based on alleged retaliation for plaintiff's political views); cf. Collins, 244 F.3d at 251-52 (affirming dismissal of substantive due process claim

---

[7]To the extent that ARCAM's complaint might be construed as alleging misconduct outside the scope of the First Amendment (say, misconduct based on personal antipathy), it would fare no better. See, e.g., Collins, 244 F.3d at 251; Amsden, 904 F.2d at 751, 757.

-27-

predicated on allegations of unconstitutional retaliation in denial-of-licensure case).  We add only that the application of this prophylactic rule depends only on whether a specific constitutional provision addresses the type of conduct at issue; it does not depend on a prediction that the complaining party will be successful in pursuing a claim under the applicable provision, nor does it depend on a conclusion that the party has a valid claim thereunder.  See, e.g., Albright v. Oliver, 510 U.S. 266, 273-75 (1994).  Consequently, it does not matter that the district court dismissed ARCAM's First Amendment claim.[8]

### B.  **Equal Protection**.

The equal protection guarantee of the Fourteenth Amendment prohibits the state from "deny[ing] any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  With reference to a governmental action, this language has been interpreted to mean that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985).  Its protections extend to both legislative and executive conduct.  See Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 445 (1923).

As said, this case is most analogous to cases of denials of benefits such as licenses or permits.  That particular model of

---

[8]As stated earlier, the dismissal of ARCAM's First Amendment claim is not now before us.

equal protection analysis, which we describe below, is what we apply here.

Where applicable state law vests the decisionmaker with discretionary authority to award or withhold a state benefit, a plaintiff who grounds an equal protection claim on the denial of that benefit faces a steep uphill climb. See PFZ Props., Inc. v. Rodriguez, 928 F.2d 28, 32 (1st Cir. 1991) (explaining that a denied applicant's allegations of differential treatment resulting from the decisionmaker's illegitimate motives do not normally amount to an equal protection violation). In benefit-denial cases, a plaintiff can succeed only if he shows that (i) he was treated differently than other similarly situated supplicants and (ii) the differential treatment resulted from a gross abuse of power, invidious discrimination, or some other fundamental procedural unfairness.[9] See, e.g., id.; Creative Env'ts, 680 F.2d at 832 n.9. Even an arbitrary, bad-faith denial of a benefit in derogation of state law, without more, will not cross the constitutional threshold needed for

_____

[9]Although a few of our earlier equal protection cases intimate a less demanding standard, see, e.g., Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. of Selectman, 878 F.2d 16, 21 (1st Cir. 1989), our jurisprudence has evolved. In recent years, we routinely have applied the more stringent standard articulated above. See, e.g., SFW Arecibo, Ltd. v. Rodríguez, 415 F.3d 135, 142 (1st Cir. 2005); Collins, 244 F.3d at 251; Baker v. Coxe, 230 F.3d 470, 474 (1st Cir. 2000); Nestor Colon, 964 F.2d at 44; PFZ Props., 928 F.2d at 32. While this formulation may not be appropriate in all equal protection cases, it is the proper standard in all cases in which a plaintiff premises an equal protection claim on a discretionary decision denying a state or local benefit.

an equal protection claim.  <u>Baker</u> v. <u>Coxe</u>, 230 F.3d 470, 474 (1st Cir. 2000).

This is a high hurdle, but its height makes eminently good sense.  Otherwise, a disappointed applicant for a state or local benefit could manufacture a constitutional claim by the simple expedient of alleging differential treatment.  Were that the rule, the correctness of every state or local benefit denial would become a federal case.

With this infrastructure in place, we turn to ARCAM's complaint to see if its allegations suffice to state a cognizable equal protection claim.  We think not.

ARCAM attempts to show differential treatment through its allegation that BDE granted the loan application of another entity, Pollos Picú.  Although this allegation arguably suffices, for pleading purposes, to establish that BDE treated another loan applicant differently, ARCAM has pleaded no facts to indicate that Pollos Picú was a similarly situated borrower.  <u>See</u> <u>Redondo-Borges</u> v. <u>U.S. Dep't of Hous. & Urban Dev.</u>, 421 F.3d 1, 9 (1st Cir. 2005) (holding unsupported conclusory allegations insufficient to withstand Rule 12(b)(6) motion to dismiss).  Indeed, the only comparator contained in the complaint indicates a <u>dissimilarity</u>; ARCAM avers that Pollos Picú "was undergoing extremely difficult financial conditions," which it concedes was "quite opposite to the positive projections and financial securities presented by ARCAM."

In a context in which the directors' discretionary decision to grant or deny a loan depends on a myriad of imbricated factors (e.g., the applicant's balance sheet, financial history, past performance, business plan, prospects, management, and available collateral), it is difficult to imagine how an equal protection plaintiff could prove that two loan applicants at opposite ends of the spectrum were similarly situated. This is especially true when the lender is obligated, by statute, to speculate about such imprecise factors as the applicant's potential for bolstering the local economy and the likelihood that subsidization will result in a diminished need for imports. See Nordlinger v. Hahn, 505 U.S. 1, 10 (1992) (suggesting that to state a viable equal protection claim, a plaintiff must show that it sustained disparate treatment compared to a person that is alike in "all relevant respects"). When, as in this case, the complaint contains not so much as an inkling of the basis for a claim of similarity, the plaintiff will have fallen short of carrying its modest burden under Rule 12(b)(6).

In all events, there is a more basic reason why ARCAM's equal protection claim does not pass constitutional muster: its allegations fail to satisfy the second half of the relevant equal protection test. Its complaint offers no allegations indicating that the disparate treatment which it bemoans resulted from a gross abuse of power, invidious discrimination, or fundamentally unfair procedures. We explain briefly.

The second and third categories are easily set aside. ARCAM's allegations do not implicate "invidious discrimination" as that phrase is used in our equal protection lexicon. Invidious discrimination means discrimination based on suspect or quasi-suspect classifications (such as race or gender). See Nestor Colon, 964 F.2d at 44; PFZ Props., 928 F.2d at 32. Such classifications trigger heightened scrutiny for equal protection purposes. City of Cleburne, 473 U.S. at 440-41. The universe of suspect or quasi-suspect classifications does not encompass legislative classifications, such as classifications premised on political affiliation. See Vieth v. Jubelirer, 541 U.S. 267, 293 (2004). Consequently, ARCAM's allegations of political discrimination and retaliation are not allegations of invidious discrimination. See Nestor Colon, 964 F.2d at 44; PFZ Props., 928 F.2d at 32.

By like token, ARCAM does not base its equal protection claim on procedural irregularities or some associated unfairness. Any such claim is, therefore, waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). At any rate, there is nothing in the facts alleged to indicate the sort of fundamentally unfair procedural rigamarole that might support an equal protection claim.[10]

Of course, the complaint makes crystal clear ARCAM's frustration with both the amount of information that BDE requested

---

[10]We add, moreover, that Calderón — the sole defendant before us — had no direct responsibility for BDE's procedures.

in order to process the loan application and the subordination condition. There is nothing fundamentally unfair, however, about these demands. It is hard to believe that any responsible financial institution would loan $5,000,000 to an unproven borrower without requiring the submission of detailed background information. To this, we add the obvious: there is nothing unconscionable (or even untoward) about a bank demanding that a borrower post significant collateral as a condition to obtaining a multi-million-dollar loan. Cf. P.R. Laws Ann. tit. 7, § 611b(d) (authorizing BDE's board of directors to require the pledging of collateral as a precondition to granting loans).

This leaves the first category: gross abuse of power. We have equated this concept with the "shocks the conscience" concept used in substantive due process cases. See Baker, 230 F.3d at 474. The record makes manifest that ARCAM cannot succeed on this theory.

According to ARCAM, the alleged abuse of power is Calderón's supposed intervention to ensure that BDE would deny the loan (purportedly as a reprisal for Pagán's political views and activities). To the extent that a plaintiff challenging a discretionary decision to deny a benefit claims to be entitled to redress based on allegations of unconstitutional political discrimination or retaliation, he cannot rely on the Equal Protection Clause but, rather, must bring his claim under the specific provisions of the First Amendment. See Rosenfeld v. Egy,

-33-

346 F.3d 11, 15 (1st Cir. 2003) (rejecting equal protection claim premised on allegations of retaliatory refusal to grant a license because the claim substantially overlapped with the plaintiff's First Amendment claim); Nestor Colon, 964 F.2d at 45 (finding "little basis or justification for applying equal protection analysis" in such a situation because the First Amendment already protects individuals against unconstitutional political discrimination and retaliation).

This principle is dispositive here. In point of fact, ARCAM brought a First Amendment claim bottomed on the same allegations. That is telling — and the fact that the lower court dismissed that claim is neither material to our analysis nor before us on this appeal. As is true in the substantive due process context, this rule does not depend on the likely success of the plaintiff's First Amendment claim; so long as his allegations of political discrimination fit within the contours of the First Amendment, they are, a fortiori, insufficient to ground a claim that the politically-inspired misconduct violated equal protection guarantees. See Ruiz-Casillas, 415 F.3d at 134 (holding that an appellant's equal protection claim, which was premised on allegations of political discrimination, "flounders, as it is a mere restatement of [her] failed First Amendment claim").

The bottom line is that ARCAM's allegations about Calderón's untoward influence over BDE's decisionmaking do not suffice to state a viable equal protection claim.

## IV. CONCLUSION

We need go no further. To summarize, ARCAM is the only plaintiff that asserts any direct injury resulting from Calderón's alleged misconduct. The claims of Pagán, Vilanova, and the guarantors that are before us on appeal must, therefore, fail for lack of standing. And while ARCAM enjoys standing to pursue its allegations of substantive due process and equal protection violations, those allegations do not state viable constitutional claims (and, thus, do not survive scrutiny under the first part of the tripartite qualified immunity test). Consequently, we reverse the district court's denial of Calderón's motion to dismiss on the basis of qualified immunity and remand the case to the district court for further proceedings consistent with this opinion.

**Reversed and remanded**.