# United States Court of Appeals
## For the First Circuit

No. 03-1320

JOEL ROSENFELD,

Plaintiff, Appellant,

v.

DAVID C. EGY and ALBERT J. BAIMA,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Boudin, Chief Judge,

Howard, Circuit Judge,

and DiClerico,* District Judge.

Robert W. Walker for appellant.
Stephen C. Pfaff, with whom Douglas I. Louison and Merrick, Louison & Costello, LLC, were on brief, for appellee David Egy.
William P. Breen, Jr., with whom Murphy, Hesse, Toomey & Lehane, LLP, were on brief for appellee Albert J. Baima.

October 2, 2003

*Of the District of New Hampshire, sitting by designation.

**HOWARD**, **Circuit Judge**.  Challenging certain decisions of the police chief and the conduct of a fellow officer, a discharged police officer sought relief in federal court under 42 U.S.C. § 1983 and Massachusetts law.  The district court granted summary judgment for the defendants on the merits of all claims except one for assault and battery, over which it declined to exercise supplemental jurisdiction.  See 28 U.S.C. § 1367(c).  The discharged officer now appeals.  Having viewed the evidence and all reasonable inferences in the light most favorable to the discharged officer, we conclude that summary judgment was properly entered.

## I.

Plaintiff-appellant Joel Rosenfeld was suspended from the Millis, Massachusetts, Police Department on May 3, 1998.  On that date, Rosenfeld was also required to surrender both his service firearm and his firearms license.  Defendant-appellee Police Chief Albert Baima ordered these actions pending an investigation of the circumstances surrounding an April 30th station-house altercation between Rosenfeld and fellow officer David Egy, the other defendant-appellee.  For his own part in the altercation, Egy was placed on administrative leave and ordered to surrender both his service firearm and firearms license.

Although Egy eventually was reinstated to the active roster, Rosenfeld was not.  Nor did Rosenfeld's troubles end there.

-2-

On October 13, 1998, Baima denied Rosenfeld's license-to-carry renewal application,[1] which Rosenfeld had submitted (along with several letters of recommendation) following the expiration of his confiscated license.

Rosenfeld also was experiencing problems at home. In December 1998, Rosenfeld's wife, Charlotte, filed for divorce. Based on an affidavit filed with the probate court, Charlotte soon thereafter obtained an ex parte restraining order against Rosenfeld.[2] Subsequently, a hearing was held to determine whether the ex parte order should be continued in effect. Rosenfeld, Egy, and Baima were present at this hearing, during which Egy submitted to the probate judge a written police report detailing Rosenfeld's alleged failure to comply with the initial order. The court ultimately continued Charlotte's restraining order.

Although the above events are undisputed, their causes are hotly contested. Specifically, the parties dispute the actual motivations behind Charlotte's procurement of the restraining order and Baima's decision to deny the renewal application. An

---

[1]Massachusetts law invests firearms-licensing authority in the chief of police. See Howard v. Chief of Police of Wakefield, 794 N.E.2d 604, 606 (Mass. App. Ct. 2003) ("[A] chief of police may issue a carrying license 'if it appears that the applicant is a suitable person to be issued such license' and has an acceptable reason for requesting such a license.") (quoting Mass. Gen. Laws ch. 140, § 131(d)).

[2]Charlotte's Affidavit of Irreparable Harm alleged, inter alia, that she twice had been raped by Rosenfeld.

appreciation of the parties' competing versions requires some backtracking.

In 1986, Officer Rosenfeld had sued Chief Baima for trespassing on his property. Apparently, Baima had entered Rosenfeld's home to ensure that Rosenfeld, who had called in sick to work that day, was genuinely sick. In 1987, the Millis Board of Selectmen held seemingly unrelated hearings to determine whether Baima should be removed as police chief.[3] Although Rosenfeld, Egy, and several other police officers testified against Baima at the hearings, the Board took no adverse action. Rosenfeld believes that Baima has held a grudge against him ever since.

Despite any grudge that may have existed, Baima and Rosenfeld enjoyed a "professional" working relationship during the ten years that followed the 1987 hearings. But in 1997, a series of events caused the relationship to sour. The problems began when Charlotte Rosenfeld informed Officer Egy that her husband had been abusing her. Egy thereafter began calling the Rosenfeld home three-to-four times per day, allegedly out of concern for Charlotte's safety. Rosenfeld contends, however, that he never

---

[3]Baima testified during his deposition that these hearings were motivated by political differences, including a running dispute between himself and the Board of Selectmen over who should control certain functions within the Millis Police Department. Rosenfeld contends that Baima also believed that Rosenfeld's mother had some responsibility for instigating the hearings.

abused Charlotte and that, in fact, Egy and Charlotte were involved in an extramarital affair.

Disgusted with the "constant interaction between Charlotte and Egy under the guise of friendship," Rosenfeld initiated the April 30, 1998 altercation. Upon encountering Egy at the station house, Rosenfeld demanded that Egy stay away from Charlotte. Egy refused, stating that he knew all about Rosenfeld's spousal abuse. To prove his point, Egy produced a photograph depicting Charlotte with a black eye. At some point, Egy also struck Rosenfeld in the chest.

The following day, Rosenfeld notified Chief Baima of Egy's assault. When asked to explain his actions, Egy informed Baima that Rosenfeld had been abusing Charlotte. Thereafter, Baima turned the investigation over to the district attorney, removed Rosenfeld from the active duty roster, and ordered Rosenfeld to surrender his service firearm and firearms license.

These decisions, together with Egy's assault, Egy's involvement in the subsequent restraining-order proceedings, and Baima's eventual denial of Rosenfeld's firearms renewal application, were the primary bases for Rosenfeld's lawsuit. Rosenfeld's somewhat-rambling complaint contained fourteen separate counts, collectively alleging violations of the First, Fourth, and Fourteenth Amendments, as well as several constitutional and common-law torts under Massachusetts law.

-5-

Following discovery, Egy and Baima moved for summary judgment on all of Rosenfeld's claims. As noted earlier, the district court granted summary judgment on all counts except an assault-and-battery count, which it dismissed without prejudice under 28 U.S.C. § 1367(c). See Rosenfeld v. Egy, No. Civ. A. 01-10730-DPW, 2003 WL 222119 (D. Mass. Jan. 29, 2003) (memorandum and order on motion for summary judgment). The court reasoned, inter alia, that (1) Baima was entitled to qualified immunity on claims arising out of his denial of Rosenfeld's firearms renewal application, and (2) the Rooker-Feldman doctrine barred certain claims against Egy.

This appeal followed.

## II.

We review summary judgment decisions de novo, after viewing the evidence and all reasonable inferences in the light most favorable to the non-moving party. Rosenberg v. City of Everett, 328 F.3d 12, 17 (1st Cir. 2003). Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Rosenfeld raises several arguments on appeal challenging the district court's entry of summary judgment. Having considered

all such arguments, we agree with the district court that summary judgment was proper on all counts except the assault-and-battery count. Because we are convinced by the court's thorough reasoning with respect to most of Rosenfeld's claims, we affirm its entry of judgment on those claims without further elaboration. In our view, only two issues warrant further discussion: (1) whether the district court properly granted summary judgment for Baima on Rosenfeld's claim that the denial of his firearms renewal application deprived him of his rights under the First and Fourteenth Amendments to the United States Constitution, and (2) whether the district court properly granted Egy summary judgment on Rosenfeld's constitutional claim against him. We discuss these issues in turn.

### A.  **The Denial of the Renewal Application**

We first consider Rosenfeld's claim that Baima's "refusal to renew [Rosenfeld's] license to carry ...[,] after receiving no corroborating evidence of Rosenfeld's alleged domestic abuse[,] was nothing more than retaliatory discipline originating from Baima's discriminatory animus." Rosenfeld contends that this "discriminatory animus," allegedly rooted in hard feelings about Rosenfeld's 1986 trespass suit and 1987 testimony before the Millis Board of Selectmen, caused Baima to deny the renewal application in violation of Rosenfeld's rights under the First and Fourteenth Amendments.

In granting summary judgment for Baima on this claim, the district court ruled that Baima was entitled to qualified immunity. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) ("[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known."). The able district court judge may well have decided this question correctly, but we need not and do not reach it; Rosenfeld's claim fails because no reasonable jury could find either a First or Fourteenth Amendment violation on the facts that Rosenfeld has adduced. Cf. Saucier v. Katz, 533 U.S. 194, 201 (2001) ("A court required to rule upon the qualified immunity issue must consider, then, this threshold question:  Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?  This must be the initial inquiry."  (citation omitted)).

Before turning to the First Amendment claim, we dispose of Rosenfeld's Fourteenth Amendment equal protection and substantive due process claims, which do not require extensive analysis.  As to equal protection, Rosenfeld has not presented sufficient evidence to show that he was treated differently than similarly situated individuals.  Moreover, this claim substantially overlaps with his stronger First Amendment claim addressed below.

See Nestor Colon Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 44-45 (1st Cir. 1992) ("There is an obvious danger to opening up local permitting decisions to detailed federal judicial scrutiny under equal protection rubric. If disgruntled permit applicants could create constitutional claims merely by alleging that they were treated differently from a similarly situated applicant, the correctness of virtually any state permit denial would become subject to litigation in federal court. . . . Given the overlap of [plaintiff's First Amendment and equal protection claims], and the vast problems that would be created, we see little basis or justification for applying equal protection analysis in the present situation.").

Regarding substantive due process, Rosenfeld has neither demonstrated a trialworthy issue as to whether Baima's decision "shocks the conscience" nor identified a protected property or liberty interest infringed by the non-renewal of his license. See Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 622 (1st Cir. 2000) ("There are two theories under which a plaintiff may bring a substantive due process claim. Under the first, a plaintiff must demonstrate a deprivation of an identified liberty or property interest protected by the Fourteenth Amendment. Under the second, a plaintiff is not required to prove the deprivation . . ., but, rather, he must prove that the state's conduct 'shocks the conscience.'" (citation omitted)); Howard, 794 N.E.2d at 607 ("The

-9-

Declaration of Rights of the Massachusetts Constitution provides the private citizen no right to keep and bear arms, and thus there is no question of a property right or deprivation of liberty involved in the statutory procedures for obtaining a license to carry firearms." (citations and internal quotation omitted)).

To prevail on his First Amendment retaliation claim, Rosenfeld must show that his constitutionally protected conduct -- his 1986 lawsuit and 1987 testimony -- was a "substantial factor" behind Baima's decision to deny the renewal application. See Collins v. Nuzzo, 244 F.3d 246, 251-52 (1st Cir. 2001). If Rosenfeld meets this threshold burden, the burden shifts to Baima to prove by a preponderance of the evidence that he would have reached the same decision even in the absence of Rosenfeld's 1986 lawsuit and 1987 testimony. See id.; see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

Rosenfeld attempts to satisfy his threshold burden by calling our attention to a few random comments allegedly made by Baima during the ten years that followed the 1987 hearings. We are presented with the deposition testimony of three department officers, all of whom testified that, at one time or another, Baima expressed to them his displeasure with the events surrounding the 1987 hearings. Relevant portions of these depositions are reproduced below.

-10-

Q: Now, you testified previously that Mr. Baima had said at one point in time in the locker room that he was going to get the people involved in the hearings, do you recall that testimony?

A: Yes.

Q: When was it that he said that?

A: That wasn't all that long ago. He had always expressed that up until a short time before he stopped being chief [in June 1999].

Q: How many times did you hear him say, I am going to get everybody involved in that?

...

A: Three, four times.

Q: Would it be fair to say the time in the locker room was ten years after the hearings had taken place?

A: Basically.


Deposition of Officer MacLeod

Q: Are you aware of any conversation in which Baima stated that it was his intent to retaliate against individuals that had previously provided testimony against him before the board of selectmen?

A: That isn't the wording he used, but the substance.

Q: Well, tell me about the wording he used.

A: We were going to [a seminar].... On the way over he was talking about the new board of selectmen, he said, "They're just as bad as the last; they're after me.... I am going to get everybody that tried to screw me during those years."

Q: What conduct or statements did Baima make that you are aware of which led you to conclude or believe that [Baima] did not like [Rosenfeld]?

A: He had made a comment one time about the fact that Joel had sued him and that he'd never forget it.

Q: Any other comments?

A: Not that I recall exactly anything. He made comments in passing sometimes, but I don't recall any comments that were directed against [Rosenfeld].

"While ambiguous remarks may, under some circumstances, help to illuminate the summary judgment record, such remarks rarely will suffice to conceive an issue of material fact when none otherwise exists." National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 743-44 (1st Cir. 1995). Baima's statements, even if viewed in the most cynical light, are at best ambiguous references to a decade-old grudge held against a number of individuals. In fact, the only testimony concerning Rosenfeld himself, that provided by Officer Quinn, speaks in terms of an unpleasant memory and not in terms of revenge. As the district court properly noted in its discussion of a parallel claim, evidence of a free-floating desire to get even is simply not enough to establish the requisite "substantial factor." Were it otherwise, the threshold hurdle required by the Constitution would amount to little more than a stepping stone.

Additionally, Rosenfeld's 1987 testimony is too far removed in time from Baima's 1998 decision to ground a reasonable inference of retaliation. As we frequently have observed in antidiscrimination cases, "the inference of a causal connection becomes tenuous with the passage of time." Dressler v. Daniel, 315 F.3d 75, 80 (1st Cir. 2003) (affirming summary judgment upon finding that no reasonable factfinder could find a causal connection between the protected conduct and an adverse action taken two years later); see also Lewis v. Gillette Co., 22 F.3d 22, 25 (1st Cir. 1994) (granting summary judgment where more than two years had elapsed between the protected conduct and the alleged retaliation); Mesnick v. General Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991) (holding that a nine-month period between the protected conduct and alleged retaliation undermined the inference of causation).

> We have previously stated:

> [A] court pondering a [summary judgment] motion need not embrace inferences that are wildly improbable or that rely on 'tenuous insinuation.' . . . [E]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.

National Amusements, Inc., 43 F.3d at 743-44 (citations omitted and emphasis added). Given the tenuous nature of Rosenfeld's evidence

-13-

and the stronger competing evidence on which we next focus, we believe that the inferences Rosenfeld invites us to draw are improbable.

Even assuming _arguendo_ that Baima's comments are unambiguous and that the 1986 lawsuit and 1987 testimony are close enough in time to the 1998 license denial to establish a reasonable inference of retaliatory motive, such an inference is considerably weakened by other facts in the record. See Lewis v. City of Boston, 321 F.3d 207, 220 (1st Cir. 2003) (finding that, in this particular case, "the inference carried by the temporal proximity . . . dissipates when consideration is given to the attendant circumstances" (emphasis added)). Not only does the record contain evidence disputing the assertion that Baima held a grudge against Rosenfeld, it also contains strong evidence that Baima's non-renewal of Rosenfeld's license would have occurred irrespective of their history.

First, the evidence portrays the Rosenfeld-Baima relationship in a way that calls into question Rosenfeld's description of Baima as a person he perceived to be a grudge-holding, revenge seeker. For example, during his deposition, Rosenfeld testified that Baima had been an invited guest at his wedding and that Baima "might have" attended not only the wedding but also other family functions such as a bar mitzvah and a post-funeral reception in the Rosenfeld home. Both men testified that

-14-

they enjoyed a professional relationship with the other, and Rosenfeld acknowledged that Baima had displayed no animosity toward him during the ten years following the 1987 hearings. Officer Dixon, one of the three officers who testified concerning comments allegedly made by Baima, also testified that it was his understanding that Chief Baima was a friend to Rosenfeld. While such evidence is not dispositive, it serves to weaken further an inference that already is too speculative.

Second, and more importantly, Baima had a compelling reason for denying Rosenfeld's renewal application: substantiated allegations of spousal abuse. Specifically, Baima had before him a photograph depicting Charlotte with a bruised face, a report from Egy detailing Charlotte's accusations, and a report from a third officer, Officer MacLeod, stating that he had "seen first-hand examples of [Rosenfeld's] physical violence towards [Charlotte] and [had] heard talk through members of the Norfolk Hunt Club [regarding] this." This considerable evidence of spousal abuse available to Baima at the time of his decision strongly suggests that Baima denied the renewal application because Rosenfeld failed to satisfy the "suitable person" standard used in Massachusetts to govern the issuance of firearm permits. See Mass. Gen. Laws ch. 140, § 131(d); see also Howard, 794 N.E.2d at 606 (noting that the

-15-

"suitable person" standard "vests in the chief broad discretion or 'considerable latitude'").[4]

In summary, there was insufficient evidence to establish a trialworthy issue on Rosenfeld's retaliation claim. On the record as a whole, the isolated comments to which Rosenfeld points are insufficient to ground a finding that Baima's non-renewal of Rosenfeld's license was grounded in retaliation and would not have occurred absent the parties' tangled history. No reasonable factfinder could conclude that Baima's conduct deprived Rosenfeld of his First Amendment rights.

B. **The Federal Constitutional Claim Against Egy**

In his complaint, Rosenfeld contended that his constitutional rights were violated as a result of Egy's improper involvement in both the issuance and continuance of Charlotte's restraining order. As we understand it, Rosenfeld's position is

---

[4]Whether or not Baima acted within the state-law bounds of discretion is, of course, a different question. For example, Rosenfeld contends that Baima should have given more weight to the district attorney's letter, which stated that the prosecution could not go forward due to Charlotte's failure to cooperate. Rosenfeld also alleges that the photograph of Charlotte was "doctored" by Egy. If Rosenfeld wants to argue that he is, in fact, a "suitable person," his proper recourse is with the state courts. See Mass. Gen. Laws ch. 140, § 131(f) ("Any applicant or holder aggrieved by a denial, revocation or suspension of a license . . . [may] file a petition to obtain judicial review in the district court having jurisdiction in the city or town wherein the applicant filed for, or was issued, such license."). At oral argument, we were advised that an appeal on these matters was still pending before the Wrentham District Court.

that a viable § 1983 claim exists because Egy "redirected the Probate Court's attention away from the truth and [deprived] Rosenfeld [of] the opportunity to address Charlotte's fabricated allegations which would have cleared his name and terminated the restraining order which seized his liberty." For support, Rosenfeld argues that Egy both coerced Charlotte into obtaining the ex parte restraining order and presented to the probate court at the continuance hearing a false report, which called into question Rosenfeld's compliance with the ex parte order. Neither issue was raised before the probate court.

Without reaching the merits of this amorphous claim,[5] the district court entered summary judgment for Egy on the threshold ground that the claim was barred by the Rooker-Feldman doctrine. See Mandel v. Town of Orleans, 326 F.3d 267, 271 (1st Cir. 2003) (noting that the Rooker-Feldman doctrine is "at least quasi-jurisdictional") (citing Picard v. Members of the Employee Ret. Bd. of Providence, 275 F.3d 139, 145 (1st Cir. 2001)); see also Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923); D.C. Ct. of App. v. Feldman, 460 U.S. 462 (1983). In the court's view, an assessment of the merits of Rosenfeld's claim would effectively require it to review judgments made by the probate court in issuing, and then continuing, the restraining order. Rosenfeld

_____

[5]The district court assumed, as do we, that Rosenfeld is alleging a violation of his Fourth Amendment rights.

-17-

argues that the doctrine does not apply because he is not here attacking the restraining order per se. He is wrong.

We have described the contours of the Rooker-Feldman doctrine as follows:

> The Rooker-Feldman doctrine prohibits federal district and circuit courts from reviewing state court judgments. Where a party did not actually present its federal claims in state court, Rooker-Feldman forecloses lower federal court jurisdiction over claims that are inextricably intertwined with the claims adjudicated in a state court. A federal claim is inextricably intertwined with the state-court claims if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it.

Sheehan v. Marr, 207 F.3d 35, 39-40 (1st Cir. 2000) (citations and quotation marks omitted); see also Mandel, 326 F.3d at 271 ("Although res judicata doctrine would often achieve similar effects, Rooker-Feldman . . . is widely used by the federal court to prevent end-runs around state judgments."); Wilson v. Shumway, 264 F.3d 120, 126 (1st Cir. 2001) (observing that 42 U.S.C. § 1983 is not to be used as a vehicle for avoiding application of the Rooker-Feldman doctrine).

Rosenfeld's alleged constitutional injury -- the restraining order that "seized his liberty" -- could only exist to the extent that the probate court wrongly decided to issue, and later continue, the restraining order. In other words, Rosenfeld's liberty never would have been "seized" -- and his dubious

-18-

constitutional claim never raised -- had the probate court determined that a restraining order was not warranted. Rosenfeld's claim against Egy is, then, essentially a challenge to the reliability of the evidence supporting the continuance of the restraining order -- an issue that is "inextricably intertwined" with the claims adjudicated in state court.  The <u>Rooker-Feldman</u> doctrine prevents us from addressing it.

## III.

For the reasons stated above, the judgment of the district court is **<u>affirmed</u>**.