# United States Court of Appeals
## For the First Circuit

No. 10-1881

DR. EFRAÍN GONZÁLEZ-DROZ ET AL.,

Plaintiffs, Appellants,

v.

DR. LUIS R. GONZÁLEZ-COLÓN ET AL.,

Defendants, Appellees.

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Boudin, Selya and Dyk[*], Circuit Judges.

Roberto Ariel Fernández-Quiles for appellants.
Peter A. Gaido, with whom Gaido & Fintzen were on brief, for American Academy of Cosmetic Surgery, amicus curiae.
Gloria Robison-Guarch, Assistant Solicitor General, Commonwealth of Puerto Rico, with whom Irene Soroeta-Kodesh, Solicitor General, Leticia Casalduc-Rabell and Zaira Giron-Anadon, Deputy Solicitors General, were on brief, for appellees.

September 16, 2011

---

[*]Of the Federal Circuit, sitting by designation.

**SELYA**, **Circuit Judge**.  For many years, all licensed physicians in Puerto Rico could perform cosmetic surgery.[1]  The landscape changed in 2005, when the Puerto Rico Board of Medical Examiners (the Board) promulgated a first-in-the-nation regulation that limited the practice of cosmetic medicine to particular classes of medical specialists.  In due course, the Board enforced the regulation against a physician who, though generally licensed to practice medicine, did not possess the required specialty board certification.

This litigation arises in consequence of that enforcement effort.  The operative pleading, the second amended complaint, challenges the constitutionality of both the regulation and the license suspension.  Faced with cross-motions for summary judgment, the district court disposed of these challenges on the primary ground that the defendants (the members of the Board and the Board's investigative officer) enjoyed various kinds of immunity. González-Droz v. González-Colón, 717 F. Supp. 2d 196, 206-16 (D.P.R. 2010).  The court did not reach the underlying constitutional questions.  Although our reasoning and approach differ sharply from those of the court below, we affirm the entry of judgment for the defendants.

---

[1] The parties treat the terms "cosmetic surgery," "cosmetic medicine," and "aesthetic medicine" as rough equivalents.  We do the same.

-2-

## I.  BACKGROUND

Many of the background facts are set forth in our earlier opinion affirming the denial of preliminary injunctive relief in this case.  See González-Droz v. González-Colón, 573 F.3d 75, 77-79 (1st Cir. 2009).  We assume the reader's familiarity with that account.

We start with the dramatis personae.  The plaintiff (the appellant here) is Efraín González-Droz, a physician licensed to practice in Puerto Rico.[2]  The defendants are the members of the Board and its investigative officer.  The Board, acting under the authority of the Puerto Rico Department of Health, is responsible for medical licensure in the Commonwealth.  At the times relevant hereto, it was empowered to promulgate regulations relating to the practice of medicine.  See P.R. Laws Ann. tit. 20, § 37 (repealed 2008).[3]

After graduating from medical school, the plaintiff obtained board certification in obstetrics and gynecology.  He

---

[2] The plaintiff's wife and their conjugal partnership are named as additional plaintiffs.  The district court dismissed their claims for lack of standing.  González-Droz, 717 F. Supp. 2d at 205-06.  That ruling has not been challenged on appeal.  Accordingly, we treat Dr. González-Droz as the sole plaintiff.

[3] On August 1, 2008, the Puerto Rico legislature passed a statute dissolving the Board.  A successor entity, the Medical Discipline and Licensure Board, was created in its place.  See P.R. Laws Ann. tit. 20, §§ 131-135j.  It also has the power to promulgate regulations.  Id. § 132e(b).  Notwithstanding these changes, the regulation at issue remains in full force and effect.

began practicing that specialty in Puerto Rico in 1995. While practicing, he took a number of continuing medical education courses and gradually shifted the focus of his endeavors toward cosmetic medicine. As time went by, procedures such as liposuction and breast augmentation came to dominate his practice.

The plaintiff's odyssey was not unique. In the same time frame, other doctors began to extend their practices to include cosmetic procedures. Concerned by this trend and by the lack of any recognized specialty accreditation in cosmetic medicine, the Board looked into the matter. On October 19, 2005, it issued a public notice — in effect, a regulation — explaining that it had conducted research into and analysis of the field of aesthetic medicine and had determined that:

> 1. The majority of professionals that market their services as "aesthetic medicine" are, in reality, general physicians that have no formal training supervised at a duly accredited institution able to offer the same, in the skills that are purportedly offered to the public.
> 2. There is no medical field that goes by the name of "aesthetic medicine", according to the "American Board of Medical Specialties" and it is not, and never has been a recognized specialty.
> 3. The procedures commonly marketed as "aesthetic medicine" in reality are competencies of specialties recognized by the American Board of Medical Specialties and the [Board], to wit, dermatology and plastic surgery . . . .
> 4. In reality, the so called "aesthetic medicine" is but a group of techniques and procedures belonging to dermatology and plastic surgery that is conducted by

-4-

> physicians lacking in the training required for such specialties that are required for the certification of professionals as qualified for the safe practice of said techniques for the benefit of the patient.
> 5. It will be deemed to be illegal practice of medicine [when] any person . . . advertises, practices or purports to practice the procedures that only fall under the competence of dermatologists or plastic surgeons without possessing the certification in the corresponding specialty.

The plaintiff is not board-certified in either plastic surgery or dermatology. Thus, the new rule, which we shall call "the Regulation," barred him from the practice of cosmetic medicine. Despite this impediment and notwithstanding that the Regulation survived a constitutional challenge in the local courts, see Sociedad Puertorriqueña de Medicina Estética, Inc. v. Tribunal Examinador de Médicos de P.R., Civ. No. KPE2005-4139(907), 2006 WL 4059283 (P.R. Cir. Dec. 14, 2006) (English translation unpublished), the plaintiff continued to advertise and perform cosmetic procedures.

The Board did not take the plaintiff's actions lightly; on December 12, 2006, it voted to suspend his medical license provisionally pending a hearing. At around the same time, the plaintiff (apparently unaware of this vote) moved to California and opened an office there. He did not, however, lose sight of the Regulation: on December 18, 2006, he filed suit in the United States District Court for the District of Puerto Rico, challenging its constitutionality.

-5-

On May 2, 2007, while visiting Puerto Rico, the plaintiff received a copy of the Board's written resolution memorializing its decision provisionally to suspend his license. The resolution recounted that, after the promulgation of the Regulation, the plaintiff had continued to "overtly advertise[] to the public the performance of Cosmetic Surgery," that two of his patients had filed grievances about injuries resulting from cosmetic procedures performed by him, that another patient may have died as a result of "cosmetic interventions performed by [him]," and that he had "been practicing the specialty of Plastic Surgery without being certified as a Plastic Surgeon." The resolution further stated that, because the plaintiff had engaged in the "illegal practice of medicine" and his conduct posed a risk of "harm [to] patients," the Board had suspended his license pending a hearing. It "admonished [him] to refrain from the practice of the profession until a formal administrative hearing is held."

The suspension took effect upon the plaintiff's receipt of the resolution, with a hearing to be held within fifteen days thereafter. The plaintiff was invited to appear at the hearing (with or without counsel) and present evidence. If he was unable to attend on the date designated by the Board, he could request an extension; without such a request, the hearing would proceed in his absence.

Instead of responding to the resolution, on May 11, 2007, the plaintiff — who had by then returned to California — moved in the federal court to enjoin the hearing. Three days later (May 14), the plaintiff received a summons dated May 10, setting the hearing for the afternoon of May 15. He responded through counsel that he would not attend because the matter should be pursued through the courts, "not in a kangaroo 'administrative hearing.'" He did not request a continuance.

The district court refused to grant an injunction, and the hearing proceeded as scheduled. The Board reserved decision and, on April 4, 2008, issued a final decision, suspending the plaintiff's license for five years and fining him $5,000. The plaintiff asked the district court to enjoin enforcement of the suspension and fine, but the court demurred. On an interlocutory appeal, this court affirmed the denial of injunctive relief. González-Droz, 573 F.3d at 79-82.

The plaintiff repaired to the district court and, on October 30, 2009, filed a second amended complaint. In it, he asserted that the Regulation transgressed both the Fourteenth Amendment and federal antitrust law, that the suspension of his medical license took place without due process, and that the suspension was prompted by a retaliatory animus.

Following the completion of pretrial discovery, the plaintiff moved for partial summary judgment. The defendants

-7-

cross-moved for summary judgment on all of the claims. On June 15, 2010, the district court denied the plaintiff's motion and essentially granted the defendants' cross-motion. González-Droz, 717 F. Supp. 2d at 216.[4]  The court rejected the plaintiff's antitrust claim on predictable grounds. See id. at 214-15.  It rejected the remaining claims on immunity grounds. See id. at 207-16.  It stated, however, that it considered the Regulation to be a proper exercise of the Board's authority to promulgate restrictions anent the practice of medicine. Id. at 216.  This timely appeal ensued.

## II. ANALYSIS

A court inquiring into the propriety vel non of summary judgment must take the facts and all reasonable inferences therefrom in the light most hospitable to the nonmoving party. Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 183-84 (1st Cir. 1999).  This perspective does not vary when cross-motions for summary judgment are brought.  In that event, the court must view each motion separately, perusing the record through the standard summary judgment prism. See Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 34 (1st Cir. 2005); Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996).  Summary judgment is appropriate

---

[4] We say "essentially" because the court, after jettisoning the plaintiff's claims, nonetheless ordered the Board to hold a new license suspension hearing. González-Droz, 717 F. Supp. 2d at 216. In view of the fact that the parties present no arguments touching upon this seeming anomaly, we need not probe its ramifications.

only if the record, read in the prescribed manner, "reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Estate of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010).

Appellate review of summary judgment orders is de novo. Houlton Citizens' Coal., 175 F.3d at 184. This review is not cabined by the lower court's rationale; rather, the court of appeals may affirm on any independent ground made evident by the record. Id.

Here, the district court's single-minded emphasis on immunity issues put the cart before the horse. In the circumstances of this case, no combination of immunity doctrines can obviate the need to decide the question of the constitutionality of the Regulation. We take a different approach. Refined to their essence, the plaintiff's claims (we leave to one side the antitrust claim, which is not pursued on appeal) present a more clear-cut series of dispositive issues. Where, as here, the district court does not decide the dispositive issues presented in fully briefed motions for summary judgment, we may elect in our discretion either to remand or to decide the issues. See Singleton v. Wulff, 428 U.S. 106, 120-21 (1976); N.H. Motor Transp. Ass'n v. Flynn, 751 F.2d 43, 52 (1st Cir. 1984). In this instance, the issues are purely legal and the outcome is clear. We proceed, therefore, to the merits.

As we envision it, the proper decisional matrix in this case presents three sets of issues. First, we decide whether the Regulation withstands equal protection and due process challenges. We then decide whether the actions undertaken to suspend the plaintiff's medical license offended procedural due process. Finally, we determine whether the suspension itself is open to attack on either substantive due process or First Amendment (retaliation) grounds. We address these matters below.

## A. The Regulation.

The plaintiff launches two constitutional challenges against the validity of the Regulation. We address them separately.

**1. Rational Basis**. With considerable assistance from the amicus, the plaintiff charges that limiting the practice of cosmetic medicine to board-certified plastic surgeons and dermatologists transgresses the Equal Protection and Due Process Clauses. U.S. Const. amend. XIV, § 1. In mounting this argument, the plaintiff does not allege either that he is a member of a suspect class or that the Regulation infringes a fundamental right. Consequently, we take the measure of the Regulation under rational basis review. See Medeiros v. Vincent, 431 F.3d 25, 29 (1st Cir. 2005); Baker v. City of Concord, 916 F.2d 744, 755 (1st Cir. 1990).

Rational basis review "is a paradigm of judicial restraint." FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 314 (1993).

"The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn . . . is rationally related to a legitimate state interest." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440 (1985). The challenger has the devoir of persuasion and must negate any and all conceivable bases upon which the challenged regulation might appropriately rest. Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 367 (2001); Heller v. Doe, 509 U.S. 312, 320 (1993). If any such ground exists to support the classification employed, the regulation must be upheld even if it is drawn from "rational speculation unsupported by evidence or empirical data." Beach Commc'ns, 508 U.S. at 315.

In this instance, the interests that the Regulation purposes to serve are unarguably legitimate. States — and Puerto Rico is for this purpose the functional equivalent of a state, see Exam'g Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero, 426 U.S. 572, 600-01 (1976) — have a profound interest in assuring the health of the public and, thus, in regulating the practice of medicine. See, e.g., Hillsborough Cnty. v. Automated Med. Labs., Inc., 471 U.S. 707, 719 (1985); Bigelow v. Virginia, 421 U.S. 809, 827 (1975). As a corollary of this proposition, states may act to safeguard "the integrity and ethics of the medical profession" and to protect "vulnerable groups . . . from abuse, neglect, and

mistakes" at the hands of medical practitioners. <u>Washington</u> v. <u>Glucksberg</u>, 521 U.S. 702, 731 (1997).

The plaintiff strives to convince us that the Regulation is not rationally related to these salutary purposes but, instead, draws an arbitrary distinction that is useless in promoting safe and effective health care. He begins this effort by pointing out that cosmetic medicine deals with the achievement of aesthetic ideals, whereas plastic surgery and dermatology deal with medically indicated needs for treatment and reconstruction. But this argument, which depends on oversimplification and unproven generalities, fails to demonstrate the absence of a rational basis.

Rational basis review requires only that the state could rationally have concluded that the challenged classification <u>might</u> advance its legitimate interests. <u>See</u> <u>Minnesota</u> v. <u>Clover Leaf Creamery Co.</u>, 449 U.S. 456, 466 (1981). The Board's decision to limit access to the practice of cosmetic medicine by reference to board certification in plastic surgery and dermatology satisfies this standard. In adopting the certification requirement, the Board repeatedly remarked upon the dangers attendant to cosmetic procedures and the need to guide patients to qualified practitioners.

The Board thought that a general license to practice medicine is not enough to ensure competence in this field and decided to use as a proxy for competence two closely related

-12-

specialty boards.  The plaintiff's arguments against that choice emphasize the lack of perfect symmetry between those specialties and cosmetic medicine.  But perfect symmetry is not required: as long as the premises underlying the state's reasoning are at least "arguable," the state's judgment about a matter subject to rational basis review is protected from constitutional attack.  <u>Beach Commc'ns</u>, 508 U.S. at 320.  In this case, there is no accredited specialty board for cosmetic medicine, and certification in the closely related fields of plastic surgery and dermatology arguably could be seen as a surrogate.[5]  To pass rational basis review, it is enough that the classification falls within the universe of reasonable alternatives that might serve to foster improved patient care and safety.  The Regulation achieves this benchmark.

We reject the plaintiff's insistence that the selection of this alternative is wholly arbitrary.  During their specialized residency training, both plastic surgeons and dermatologists are exposed to procedures that are indigenous to cosmetic medicine.  They develop a skill set compatible with that practice area.  Perhaps more important, both plastic surgeons and dermatologists are trained in general concepts that advance their abilities to

---

[5] Although the plaintiff rails against the use of board certification in plastic surgery and dermatology, he does not identify any other accredited specialty board that is more closely aligned with cosmetic medicine.  His point seems to be that none of the existing board certifications should be required in this practice area.

-13-

understand and perform cosmetic procedures. It was not arbitrary for the Board to conclude that such training would, on the whole, contribute to improved patient care and safety in this rapidly evolving field. See Maguire v. Thompson, 957 F.2d 374, 377 (7th Cir. 1992).

The fact that the actual practice of any particular plastic surgeon or dermatologist may not include performance of cosmetic procedures does not undercut this conclusion. The training needed to obtain board certification in these specialties overlaps substantially with the knowledge needed to practice cosmetic medicine safely and effectively. That is enough, as a constitutional matter, to justify the Board's solution.

The plaintiff complains that a classification based on board certification in other specialties is an ineffective way to foster patient choice and safety. He notes that residency programs and other prerequisites for certification in plastic surgery and/or dermatology do not encompass all, or even most, cosmetic medicine procedures; yet under the Regulation, a board-certified plastic surgeon or dermatologist may practice cosmetic medicine without proof of any additional training. In contrast, other doctors (who may have undergone additional procedure-specific training) cannot.

This plaint is unavailing. In conducting rational basis review, courts are not tasked with deciding whether a better or more effective means of classification exists. See Clover Leaf

-14-

Creamery, 449 U.S. at 470. "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." Williamson v. Lee Optical of Okla., Inc., 348 U.S. 483, 488 (1955). While the Regulation may draw an imperfect line, that circumstance alone does not render it unconstitutional. The wisdom of the Board's choice is not within the judiciary's purview. See Beach Commc'ns, 508 U.S. at 313-14.

The plaintiff seeks to derive sustenance from the fact that no other state has adopted a similar limitation with respect to the practice of cosmetic medicine. That is true as far as it goes — but it does not provide much nourishment to the plaintiff's argument. Differences in classifications among the several states, without more, do not betoken irrationality. See Nat'l Ass'n for Adv. of Psychoanalysis v. Cal. Bd. of Psychology, 228 F.3d 1043, 1053 (9th Cir. 2000). "[W]here individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued." City of Cleburne, 473 U.S. at 441-42; see Vance v. Bradley, 440 U.S. 93, 97 (1979).

-15-

The plaintiff's next argument is misdirected.  He insists that, by virtue of both training and experience, he is superbly qualified to practice cosmetic medicine.  That may be so — and the Board could, if it so chose, conduct a case-by-case assessment of each physician's qualifications in cosmetic medicine as a prerequisite to permitted practice in that field.  But the Constitution does not demand so specific a decisional matrix.  See Williamson, 348 U.S. at 489.  The state may paint with a broader brush as long as the criteria that it chooses are rationally related to some legitimate governmental purpose.  Board certification, as a practice criterion, satisfies this requirement.[6]  See Am. Med. Ass'n, State Medical Licensure Requirements and Statistics 128 (2011).  Although the point may be debatable, see, e.g., id. at 167 (discussing conflicting views among national professional organizations over precise value of board certification), the Board's decision to limit the practice of cosmetic medicine to physicians who have achieved board certification in closely related fields represents a permissible choice.  See Clover Leaf Creamery, 449 U.S. at 469.

---

[6] The amicus contends that the Board's reliance on certification is inconsistent with a federal regulation prohibiting hospitals from awarding staff privileges on the basis of board certification alone.  See 42 C.F.R. § 482.12(a)(7).  This argument was not raised below, and we repeatedly have held that "[w]hile amicus briefs are helpful in assessing litigants' positions, an amicus cannot introduce a new argument into a case."  United States v. Sturm, Ruger & Co., 84 F.3d 1, 6 (1st Cir. 1996); accord Lane v. First Nat'l Bank of Boston, 871 F.2d 166, 175 (1st Cir. 1989).

In sum, the Board, acting within the scope of its delegated authority, settled upon a regulatory classification that bears a rational relationship to the legitimate objective of promoting safe and effective medical care. Consequently, the Regulation does not contravene the Equal Protection or Due Process Clauses.

**2. Vagueness.** The plaintiff also claims that the Regulation is unconstitutionally vague because it does not clearly define its limitations. This claim need not detain us.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). This does not mean, however, that a law or a regulation must be precise to the point of pedantry. See Barr v. Galvin, 626 F.3d 99, 107 (1st Cir. 2010). Where a profession-specific regulation affords sufficient indicia of its meaning and application to those of ordinary intelligence in the profession, it is not subject to invalidation on vagueness grounds. See Doyle v. Sec'y of HHS, 848 F.2d 296, 301 (1st Cir. 1988).

In this instance, the Regulation identifies the covered procedures as those "commonly marketed" as "aesthetic medicine" and defines them with reference to plastic surgery and dermatology. This is enough to avoid a general charge of vagueness. It may be that a particular procedure exists on the margin that would leave

-17-

a physician of ordinary intelligence to wonder whether that procedure is covered by the Regulation. But no such uncertainty plagued the plaintiff in this case (or, if it did, he has not offered an example). For aught that appears, the plaintiff's practice consisted of liposuction, breast augmentation, and other procedures that fell squarely within the compass of the Regulation. There could be no doubt among medical professionals that the Regulation reaches those procedures. See id. Accordingly, the plaintiff's vagueness challenge fails.

## B. **The Suspension**.

Taking aim at a different target, the plaintiff assails, on constitutional grounds, both the procedures used to suspend his license and the suspension itself. The Due Process Clause prohibits a state from depriving a person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "This guarantee has both substantive and procedural components." Pagán v. Calderón, 448 F.3d 16, 32 (1st Cir. 2006). The plaintiff's broadside, and our ensuing analysis, implicate both theories. We also address under this rubric the plaintiff's claim of retaliation.

1. **Procedural Due Process**. The plaintiff contends that the actions undertaken to effect the suspension of his license violated his procedural due process rights. We think not.

-18-

To establish a procedural due process violation, the plaintiff "must identify a protected liberty or property interest and allege that the defendants, acting under color of state law, deprived [him] of that interest without constitutionally adequate process." Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 56 (1st Cir. 2006) (alterations, internal quotation marks, and citations omitted). Because the Board stripped the plaintiff of his license (and, thus, took away a means of earning his livelihood), he has made the necessary showing of a deprivation of a constitutionally protected property interest. See FDIC v. Mallen, 486 U.S. 230, 243 (1988); Beauchamp v. De Abadia, 779 F.2d 773, 775 (1st Cir. 1985). The question, then, is whether the process leading to that deprivation passes constitutional muster.

The basic guarantee of procedural due process is that, "before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" Amsden v. Moran, 904 F.2d 748, 753 (1st Cir. 1990) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)). No rigid taxonomy exists for evaluating the adequacy of state procedures in a given case; rather, "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481 (1972).

-19-

In this case, the plaintiff identifies the lack of a pre-deprivation hearing, the brevity of the notice afforded in advance of the hearing, and the nature of the hearing itself as hallmarks of a constitutional shortfall.  We examine this asseverational array.

In order to determine both when a pre-deprivation hearing is compulsory and what process is due, an inquiring court must balance a myriad of factors, including the private and public interests involved, the risk of an erroneous deprivation inherent in the procedures employed by the state, and the likely benefit that might accrue from additional procedural protections.  Mathews v. Eldridge, 424 U.S. 319, 335 (1976).  Whether the deprivation was, in fact, justified is not an element of the procedural due process inquiry.  See Carey v. Piphus, 435 U.S. 247, 266 (1978).

The plaintiff first upbraids the defendants for their vote to suspend his license, albeit provisionally, without an antecedent hearing.  To begin, it is difficult to imagine what value there would have been in a pre-deprivation hearing.  The plaintiff does not challenge the Board's key finding that precipitated its action: their determination that the plaintiff was practicing cosmetic medicine in violation of the Regulation.  The lack of any dispute over that key finding is telling.  See Codd v. Velger, 429 U.S. 624, 627-28 (1977) (per curiam) (finding no pre-deprivation hearing necessary when there was no factual dispute);

Barbian v. Panagis, 694 F.2d 476, 488 (7th Cir. 1982) (similar). Although the plaintiff implies that he would have challenged the constitutionality of the Regulation at the hearing, that is a question for adjudication by the courts, not the Board. Of course, the plaintiff could have contested the Board's other factual conclusions or appeared personally to plead that he should not lose his license despite the violation; thus, we proceed to assess his procedural due process claim.

The plaintiff's criticism overlooks that due process does not invariably require a hearing before the state can interfere with a protected property interest. A key datum is whether "some form of hearing is [provided] before an individual is finally deprived of [the] interest." Mathews, 424 U.S. at 333 (emphasis supplied); see Herwins v. City of Revere, 163 F.3d 15, 18 (1st Cir. 1998). Considering that the license suspension was at that point provisional (not final), that the balance of the private and public interests involved favored immediate action, and that the risk of an erroneous deprivation was very small, we conclude that a prompt post-deprivation hearing was constitutionally adequate.

In working this calculus, we give great weight to the proposition that when the state reasonably determines that a license-holder poses a risk to patient safety, pre-deprivation process typically is not required. See Patel v. Midland Mem'l Hosp. & Med. Ctr., 298 F.3d 333, 339-40 (5th Cir. 2002). In these

-21-

circumstances, moreover, the need for a pre-deprivation hearing is further diminished by the state's strong interest in upholding "the integrity of [a] state-licensed profession[]." Amsden, 904 F.2d at 755. The Board's concern that González-Droz "may harm patients" because he lacks the "training required by the [Regulation] to carry out such procedures" provided a sufficient basis for a founded conclusion that no pre-deprivation hearing was constitutionally compelled. See Nnebe v. Daus, 644 F.3d 147, 158-59 (2d Cir. 2011); Patel, 298 F.3d at 339-41.

Neither the possible risk of an erroneous deprivation nor the possible benefit of additional safeguards shifts the balance. Especially in cases involving public health and safety and the integrity of professional licensure, the force of these factors is significantly diminished by the ready availability of prompt post-deprivation review. See Nnebe, 644 F.3d at 159; Amsden, 904 F.2d at 755. In this case, the provisional suspension did not take effect until May 2, 2007. The plaintiff was afforded a hearing roughly two weeks later (prior to the Board's decision to make the suspension final). Given this chronology, we do not believe that the lack of a pre-deprivation hearing offended due process. See, e.g., Nnebe, 644 F.3d at 151, 158-59 (finding provision of a post-deprivation hearing within a similar time frame sufficiently prompt).

-22-

The plaintiff's assault on the adequacy of the notice provided in advance of the post-deprivation hearing is easily repulsed. The plaintiff focuses with tunnel vision on the summons that he received on May 14 to support an allegation that he had only a few hours' notice of the May 15 hearing. This is sheer persiflage. In reality, the notice afforded to the plaintiff and his opportunity to prepare were much greater. The plaintiff was aware more than five months earlier that his continued practice of cosmetic medicine flew in the teeth of the Regulation and placed his medical license in jeopardy. The suit that he filed in December of 2006 attests to this awareness. Moreover, the resolution that the Board delivered to the plaintiff in hand on May 2 advised him that a hearing would be held within fifteen days. Taken together, these facts demonstrate that the plaintiff had ample notice of the hearing, a fair indication of when it would occur, and a sufficient opportunity to prepare for it.[7] See, e.g., Cepero-Rivera v. Fagundo, 414 F.3d 124, 127, 134-35 (1st Cir. 2005) (finding sixteen days' notice of hearing sufficient); O'Neill v. Baker, 210 F.3d 41, 44-45, 48-49 (1st Cir. 2000) (finding six days' notice sufficient when plaintiff understood the nature of the charges three months earlier).

---

[7] It is difficult to discern what additional safeguards might have benefitted the plaintiff. The resolution unambiguously stated that a hearing would occur within fifteen days, yet the plaintiff elected to return to California.

If more were needed — and we doubt that it is — the resolution explained that if the plaintiff was unable to attend the hearing or to proceed, he could request a continuance. He eschewed that opportunity, instead telling the defendants that the issues should be resolved through litigation. This steadfast insistence on boycotting the hearing further erodes the plaintiff's claim of inadequate notice. See, e.g., Luellen v. City of East Chicago, 350 F.3d 604, 616 (7th Cir. 2003); Conward v. Cambridge Sch. Comm., 171 F.3d 12, 24 (1st Cir. 1999).

What remains is to determine whether the hearing itself offered adequate safeguards. The plaintiff's contrary claim rests primarily on an assertion that defendant José Jiménez-Rivera (Jiménez), the Board's investigative officer and the de facto prosecutor at the May hearing, infected the proceeding with a risk of bias because the plaintiff had named him months earlier as a defendant in this suit.

Certainly, "a biased decisionmaker [is] constitutionally unacceptable." Withrow v. Larkin, 421 U.S. 35, 47 (1975). But Jiménez's duties as the Board's investigative officer do not involve decisionmaking. A person who investigates and presents an agency's case, unlike a decisionmaker, does not have to be neutral. See Marshall v. Jerrico, Inc., 446 U.S. 238, 248 (1980).

In a further attack on the conduct of the hearing, the plaintiff asserts that the Board failed to demand sufficient

evidence in connection with the patient grievances to which it referred in its suspension decision. Here, however, the plaintiff had the opportunity to engage counsel and present rebuttal evidence at the hearing, see P.R. Laws Ann. tit. 3, § 2151. He could have submitted his patient files for consideration but did not do so. Given this tactical decision, he hardly can complain about the Board's reference to the dissatisfied patients' unopposed testimony, and we do not, in any event, read the Board's decision as resolving the issue of the patient grievances.

That ends this aspect of the matter. The plaintiff had notice, an opportunity to be heard, a right to counsel, and a right to present evidence to his own behoof. The Board's provision of these safeguards sufficed to meet the demands of due process. See, e.g., Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 10-11 (1st Cir. 2003).

**2.  Substantive Due Process.** The constitutional guarantee of substantive due process "functions to protect individuals from particularly offensive actions on the part of government officials." Pagán, 448 F.3d at 32. In other words, "a substantive due process claim implicates the essence of state action rather than its modalities." Amsden, 904 F.2d at 753. The plaintiff bears the burden of showing that the challenged actions were "so egregious as to shock the conscience." Pagán, 448 F.3d at 32. To sink to this level, the challenged conduct must be "truly

-25-

outrageous, uncivilized, and intolerable." Hasenfus v. LaJeunesse, 175 F.3d 68, 72 (1st Cir. 1999).

The plaintiff claims that the suspension of his license was so heavy-handed as to work a denial of substantive due process. We reject this claim out of hand. In this case, neither the Board's actions nor the result of those actions (the license suspension) remotely approach the level of a substantive due process violation. Consequently, summary judgment was inevitable on this claim.

**3. Retaliation**. The plaintiff has one more shot in his sling. He argues that the suspension of his license cannot stand because the Board's decision was in retaliation for filing this suit and his testimony in favor of another physician in a separate 2005 license-suspension case. This claim is without merit.

Citizens have a First Amendment right to engage in certain kinds of speech, including the filing of civil actions, see, e.g., Bill Johnson's Rests., Inc. v. NLRB, 461 U.S. 731, 752 (1983), and testifying at administrative hearings, see, e.g., Johnston v. Harris Cnty. Flood Control Dist., 869 F.2d 1565, 1576-78 (5th Cir. 1989). Government actors offend the First Amendment when they retaliate against an individual for constitutionally protected speech. Hartman v. Moore, 547 U.S. 250, 256 (2006). A party seeking to establish a claim of retaliation under the First Amendment must show that the conduct in which he engaged was a

"substantial" or "motivating factor" in the challenged decision. <u>Centro Medico del Turabo, Inc.</u> v. <u>Feliciano de Melecio</u>, 406 F.3d 1, 10 (1st Cir. 2005) (quoting <u>Mt. Healthy City Sch. Dist. Bd. of Educ.</u> v. <u>Doyle</u>, 429 U.S. 274, 287 (1977)). This showing necessitates proof of a causal connection between the allegedly protected speech and the allegedly retaliatory response. <u>Davignon</u> v. <u>Hodgson</u>, 524 F.3d 91, 106 (1st Cir. 2008).

In the case at hand, the plaintiff insists that the suspension decision followed two instances of protected speech and that this temporal proximity, without more, supports a conclusion that a causal connection exists between these events. Temporal proximity alone may, in certain circumstances, support an inference of retaliation. <u>See</u> <u>Philip</u> v. <u>Cronin</u>, 537 F.3d 26, 33 (1st Cir. 2008). Here, however, neither of the described incidents forges the necessary causal link.

We start with the plaintiff's suit. The Board made its decision to suspend the plaintiff's license on December 12, 2006. This occurred <u>before</u> the plaintiff filed the original complaint on December 18 and, thus, cannot plausibly be viewed as an act of retaliation.

The plaintiff rejoins that the record does not contain any minutes for a December 12 meeting of the Board and that this gap raises a genuine issue of material fact as to whether any decision was actually made on that date. This is whistling past

-27-

the graveyard: the Board's written resolution, which is a matter of record, states that the vote was taken on December 12. The plaintiff offers nothing to controvert this evidence. In the face of uncontradicted evidence, a party cannot rely on sheer speculation to deflect a motion for summary judgment. See Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010).

This leaves the plaintiff's testimony in another physician's case. The testimony occurred in October of 2005 (more than a year before the Board voted provisionally to suspend the plaintiff's license). In order to raise an inference of causation, temporal proximity must be close. See id. (holding that a "gap of several months" between protected speech and allegedly retaliatory conduct was insufficient to prove retaliation in Title VII context); Mesnick v. Gen. Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991) (finding insufficient temporal proximity in the age discrimination context when nine months had elapsed between protected conduct and alleged retaliation); see also Rosenfeld v. Egy, 346 F.3d 11, 15-17 (1st Cir. 2003). With no other evidence of causation, an interval of this magnitude cannot establish the necessary linkage between protected speech and some challenged action.

At any rate, a defendant may avoid liability in a retaliation case by showing that it would have reached the same decision absent the protected speech. Powell v. Alexander, 391

F.3d 1, 17 (1st Cir. 2004).  The plaintiff does not dispute that his actions (continuing to advertise and perform cosmetic surgery) contravened the Regulation.  The Board's decision was based on those actions (which under the Regulation constituted illegal practice).  It is, therefore, clear beyond hope of contradiction that the Board would have reached the same conclusion regardless of the plaintiff's 2005 testimony.

## III.  CONCLUSION

We need go no further.  For the reasons elucidated above, we uphold the entry of summary judgment for the defendants on all claims.

**Affirmed**.